Filed 3/12/21  P. v. Rhodes CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  SHAWN MICHAEL RHODES,  Defendant and Appellant. | D077130  (Super. Ct. No. SCN297779) |

APPEAL from a judgment of the Superior Court of San Diego County, K. Michael Kirkman, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorney Generals, for Plaintiff and Respondent.


Appellant Shawn Michael Rhodes pled guilty to second-degree burglary in 2011 and was placed on a three-year term of probation.  After absconding

from probation for seven years, Rhodes admitted to probation violations in 2019 and was sentenced to a local prison term of 16 months.

Rhodes appeals, asserting for the first time that he is eligible for mental health diversion under Penal Code[1] section 1001.36, subdivision (b)(1), and entitled to conditional reversal of the judgment and remand for the trial court to conduct a mental health diversion eligibility hearing. We conclude that Rhodes has forfeited the claim.

The parties agree the trial court erroneously imposed a probation revocation restitution fine of $300, rather than $200. We direct the trial court to modify the minute order and abstract of judgment to reflect imposition of the correct restitution fine amount. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Rhodes's 2011 Second-Degree Burglary Conviction*

In October 2011, an officer conducted a traffic stop of a vehicle in which Rhodes was a passenger. During the vehicle search, the officer found a center punch, a tool commonly used to break vehicle windows, along with other tools. Medicine bottles and mail belonging to a victim of a recent vehicle burglary were also recovered. Rhodes and the driver were arrested.

Rhodes was charged with second-degree burglary (§ 459), receiving stolen property (§§ 496, subd. (a), 17, subd. (b)(4)), and possession of burglary tools (§ 466). In October 2011, Rhodes pled guilty to second-degree burglary in exchange for dismissal of the other counts.

---

[1]     Undesignated statutory references are to the Penal Code.

2

A probation report was prepared for sentencing. In the probation interview, Rhodes denied any substance abuse issues. Rhodes stated he "experimented" with marijuana at age 17 and did not like it, and he "[r]arely" consumed alcohol. The probation officer reported that Rhodes had suffered five prior arrests and convictions, including an arrest in Colorado that resulted in charges of illicit use of controlled substances and theft. Next to the heading of "Psychological and Medical Problems," the probation officer entered, "N/A." Specifically, the probation officer did not report any information regarding any diagnosis or current treatment of "Psychological Problems."

The court suspended imposition of sentence and placed Rhodes on a three-year term of formal probation. Based on the probation officer's recommendations, the court imposed probation conditions related to alcohol and drug use. Rhodes was ordered to participate in "treatment, therapy, counseling, or other course of conduct as suggested by validated assessment tests"; successfully complete substance abuse and anti-theft counseling programs if directed by the probation officer; not use or possess alcohol if the probation officer so directed; not use any controlled substance without a valid prescription; attend self-help meetings and complete a residential substance abuse treatment and aftercare program if directed by the probation officer; and submit to any chemical test of blood, breath, or urine to determine blood alcohol content and drug use, whenever requested by the probation officer, law enforcement officer, or treatment provider.

In addition to other fines and fees, the court imposed a probation revocation restitution fine of $200, which was suspended unless probation was revoked.

## II.

### *Rhodes's 2019 Admission to Probation Violations*

From the start of probation, Rhodes reported to his probation officer only sporadically. Beginning in March 2012, Rhodes failed to appear at scheduled appointments with his probation officer. In May 2012, Rhodes was contacted by a probation officer in the field and reported that he was moving to another residence in San Diego County. He was instructed to report the change of address to his assigned probation officer; he failed to do so. Rhodes last reported to his probation officer in May 2012 before absconding and eventually moving to Colorado.[2]

The probation officer reported that Rhodes was in violation of his probation for failing to appear at scheduled probation appointments and failing to report a change of address. In August 2012, the court summarily revoked probation and issued a bench warrant for Rhodes's arrest.

More than seven years later, in November 2019, Rhodes was arrested on the outstanding bench warrant. While visiting his sister in San Diego, Rhodes was stopped by a law enforcement officer on an unrelated matter. After a records check revealed the existence of the bench warrant, Rhodes was taken into custody.

On December 9, 2019, Rhodes appeared in court for the probation revocation hearing. He waived his right to a formal hearing and admitted to the probation violations. The court formally revoked probation and continued sentencing to receive a supplemental probation report.

---

[2] Two weeks after the sentencing hearing, the court had modified probation to allow Rhodes to live in Colorado, if approved by an interstate compact, but Rhodes never submitted the necessary paperwork for approval.

At the sentencing after revocation hearing on December 30, 2019, the court considered the supplemental probation report, which set forth additional allegations of probation violations, including the failure to pay fines and restitution, obey all laws, and report new contacts or arrests by law enforcement. A criminal history search revealed that Rhodes suffered eleven new criminal convictions in Colorado and Texas between 2012 and 2018.

In April 2018, Rhodes was arrested in Colorado for shooting into an occupied house. Rhodes resisted arrest and was combative with the officers. When he was taken into custody, Rhodes complained of a medical issue and an ambulance was requested. Because he continued to be combative, he was sedated after being placed in the ambulance and transported to the Mental Health Center of Denver (MHCD) for evaluation. He was later taken into custody without further incident. In addition to the two live rounds found in his pocket during the arrest, the police recovered two semiautomatic handguns during a search of Rhodes's home. Rhodes was charged with attempted first-degree murder, in addition to other crimes. In February 2019, he pled guilty to illegal discharge of a weapon, a felony, and was placed on probation.

In November 2018, Rhodes was arrested in Colorado after a gas station employee reported to the police that Rhodes appeared drunk and was yelling that he had a gun. Rhodes pled guilty to disorderly conduct, a misdemeanor, and was given credit for time served.

In the supplemental probation interview, Rhodes claimed he had been diagnosed with anxiety and depression. He reported that he took prescribed medications for these conditions, saw a therapist twice a month and attended a weekly grief class to help him cope with the 2008 murder of his brother. Rhodes reported he had not used drugs or consumed alcohol since the

5

underlying burglary conviction;[3] he last used marijuana or alcohol in 2016. Rhodes also stated he had not been to any treatment programs since the 2011 burglary conviction.

Rhodes reported that he began working as a part-time janitor at the MHCD after the 2011 burglary conviction. He also took "music, typing, and computer classes" at the MHCD. He told the probation officer he had "been very involved at the [MHCD], which he credits as being a very positive influence" and that "[h]e has been productive and feels a change within himself to become a more productive member of society."[4]

Rhodes submitted two letters for the court's consideration in sentencing. The first letter was from Rhodes's sister, who stated the 2008 murder of their brother had sent Rhodes into "an undiagnosed deep depression" and that Rhodes had "started abusing his body mentally and physically through alcohol and substance abuse." She said she "understand[s] now he has been properly diagnosed, and is now getting professional counseling, and taking prescribed medication to help him."

---

[3]  The probation officer stated in the report that Rhodes "reported no drug use or alcohol consumption since this offense" and "claim[ed] to have not used marijuana or drank alcohol since 2016." It appears that the probation officer's use of the phrase "this offense" refers to Rhodes's 2011 burglary conviction.

[4]  The record is silent as to whether Rhodes received mental health treatment at the MHCD. As discussed *infra*, Rhodes submitted a letter from an MHCD employment specialist, who verified that she had assisted him in securing employment but did not indicate that he was being treated at the MHCD. Although he claimed one and a half years of employment at the MHCD, the probation officer verified he had been employed there for four months.

The second letter was from Cheryl Sisco, an employment specialist at the MHCD. Sisco began working with Rhodes in September 2019 and secured employment for Rhodes as a janitor. Sisco said Rhodes was considered a model employee, a "hard worker" who performed well at his job.

Rhodes's attorney asked the court to terminate probation with credit for 36 days served or terminate probation after he had served additional days in custody. She argued that the "probation officer described the underlying offense as being relatively petty" and that the case was over seven years old. She emphasized the "very nice letters" written on Rhodes's behalf, and Rhodes's recent success in securing employment and exemplary job review. Defense counsel argued local prison was not "necessary" and would cause Rhodes to lose his job.

The trial court denied Rhodes's request to reinstate and terminate probation with credit for time served. The court found that Rhodes's "continued law violations are of great concern." It noted there were "[s]ome instances, either threats that a weapon was available to the defendant or actual use of a weapon, and firearms included, all of that suggests that not only hasn't probation gone well, it would not in the future." The court declined to reinstate probation and sentenced Rhodes to a local prison term of 16 months.

The court ordered a "$300 restitution fine originally imposed[,] reimposed on the violation or $200 at the time." The minutes and abstract of judgment recorded a probation revocation restitution fine of $300.

7

## DISCUSSION

## I.

### *Retroactive Application of Mental Health Diversion*

Effective June 27, 2018, the Legislature enacted a discretionary pretrial diversion program for people with qualifying mental disorders. (§§ 1001.35, 1001.36, added by Stats. 2018, ch. 34, § 24; see *People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*) [discussing enactment of the diversion statute].) A stated purpose of the program, known as "mental health diversion," is to increase the diversion of defendants with mental disorders and mitigate their entry and reentry into the criminal justice system while protecting public safety. (§ 1001.35, subd. (a).)

"As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*Frahs*, *supra*, 9 Cal.5th at pp. 626-627; § 1001.36, subds. (b)(1)(A)–(b)(1)(F).)

Qualifying mental disorders include "mental disorder[s] as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental

Disorders [(DSM)[5]], including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia." (§ 1001.36, subd. (b)(1)(A).) "Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert. In opining that a defendant suffers from a qualifying disorder, the qualified mental health expert may rely on an examination of the defendant, the defendant's medical records, arrest reports, or any other relevant evidence." (*Ibid.*)

Pursuant to section 1001.36, the trial court may consider the defendant's ability to establish eligibility for mental health diversion "[a]t any stage of the proceedings." (§ 1001.36, subd. (b)(3).) Mental health diversion is available "at any point in the judicial process from the point at which the accused is charged until adjudication . . . ." (§ 1001.36, subd. (c).) If a defendant qualifies for diversion and performs satisfactorily in diversion, the court dismisses the criminal charges against the defendant that were the subject of the criminal proceedings at the time of the initial diversion. (§ 1001.36, subd. (e).)

In June 2020, the California Supreme Court held in *Frahs* that section 1001.36 "applies retroactively to cases in which the judgment is not yet final" because the ameliorative nature of the diversion program places it within the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). (*Frahs*, *supra*, 9 Cal.5th at pp. 624, 624-625, 630-637.) Under the *Estrada* rule, statutes that reduce

_____

[5] The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), commonly referred to as the DSM-5, is the most recent edition of the DSM.

9

punishment for criminal conduct are presumed to apply retroactively "to all persons whose judgments were not yet final at the time the statute took effect." (*Frahs*, at p. 624.) The high court found there was not a clear indication in the legislative history or text of section 1001.36 of an intent to rebut the *Estrada* presumption of retroactivity. (*Frahs*, at pp. 624-625, 626-637.) Under *Frahs*, defendants whose criminal proceedings were not yet final on appeal when section 1001.36 took effect may receive a conditional limited remand to the trial court for a diversion eligibility hearing when "the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder (§ 1001.36, subd. (b)(1)(A))." (*Frahs*, at p. 640.)

In February 2020, our high court also addressed the concepts of finality and *Estrada* retroactivity in *People v. McKenzie* (2020) 9 Cal.5th 40 (*McKenzie*). In *McKenzie*, the Supreme Court held that "a convicted defendant who is placed on probation after imposition of sentence is suspended, and who does not timely appeal from the order granting probation, may take advantage of ameliorative statutory amendments that take effect during a later appeal from a judgment revoking probation and imposing sentence." (*Id.* at p. 43.) In so holding, the court explained that "[i]n criminal actions, the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous' [citation], and there is no 'judgment of conviction' without a sentence [citation]." (*Id.* at p. 46.) The relevant inquiry for purposes of *Estrada* retroactivity is whether the " ' "criminal proceeding . . . ha[s] not yet reached final disposition in the highest court authorized to review it." ' " (*Id.* at p. 45.) The defendant in *McKenzie* was on appeal from an order revoking probation and imposing sentence when certain

10

ameliorative statutory amendments were enacted. (*Id.* at p. 43.) Because his "prosecution had not been 'reduced to final judgment at the time' the revisions took effect," the defendant was included among those to whom the benefits of the new legislation were retroactively available. (*Id.* at p. 45.)

II.

*Rhodes Forfeited the Claim to Mental Health Diversion*
*by Failing to Request It in the Trial Court*

Rhodes argues that under *Frahs*, *McKenzie*, and the mental health diversion statutes, he is entitled to a conditional reversal of the judgment and a limited remand to the trial court so he can pursue mental health diversion. He contends there is evidence in the record that he appears to be suffering from a depressive- or trauma- or stress-related mental disorder, and/or one of the "Substance-Related and Addictive Disorders" listed in the DSM-5. The People respond that Rhodes failed to preserve the claim for appeal because he did not request diversion during his probation revocation proceedings in the trial court.[6] We agree the claim has been forfeited.

A defendant who has the opportunity to seek discretionary relief in the trial court but fails to do so forfeits the right to raise the issue on appeal. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 ["[A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 following [*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497] waives or forfeits his or her right to raise the issue on appeal."]; *People v. Scott* (1994) 9 Cal.4th 331, 352-353 (*Scott*) [forfeiture results where a defendant fails to object to a

_____

[6]    In their response brief, the People rely on an unpublished opinion of a Court of Appeal of this state as persuasive authority, in violation of California Rules of Court, rule 8.1115(a). We ignore the improperly cited case.

11

trial court's discretionary sentencing choices].)  "All issues . . . are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347 fn. 9; *People v. Trujillo* (2015) 60 Cal.4th 850, 856 (*Trujillo*) [" ' " ' "[A] constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " ' "].)

Here, mental health diversion became available under section 1001.36 on June 27, 2018.  Rhodes admitted to the probation violations on December 9, 2019 and was sentenced after revocation on December 30, 2019.  Mental health diversion had therefore been available to Rhodes *eighteen months before* he was sentenced on the probation violations in December 2019.  Yet Rhodes never sought to avail himself of the diversionary relief.  Section 1001.36 requires the defendant to raise the issue of diversion and "[e]vidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert."  (Section 1001.36, subd. (b)(1)(A).)  Because Rhodes failed to request mental health diversion in the trial court, he has forfeited the right to raise the issue for the first time on appeal.

Rhodes does not argue his counsel was unaware of the 2018 enactment of the mental health diversion program.  Rather, he argues that counsel's failure to request mental health diversion at the probation revocation proceedings in December 2019 is excused on three grounds.  We find none are persuasive.

A. *People v. Perez* (2020) *9 Cal.5th 1 (Perez) Does Not Excuse Rhodes's Failure* to *Seek Diversion in the Trial Court*

12

First, Rhodes contends that it was "unclear" or "unsettled" before *Frahs* and *McKenzie* were decided that he had a right to retroactively seek mental health diversion. Therefore, his counsel was excused from pursuing diversion in the trial court under *Perez, supra*, 9 Cal.5th 1. We disagree that *Perez* applies here.

*Perez* addressed trial counsel's alleged forfeiture of a confrontation clause challenge to the hearsay basis of expert testimony. At the time of the *Perez* trial, *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*) and *People v. Montiel* (1993) 5 Cal.4th 877 (*Montiel*) were the "controlling authorit[ies] on expert testimony," and they permitted an expert to testify to "sufficiently reliable hearsay sources used in formulation of the expert's opinion." (*Perez, supra*, 9 Cal.5th at p. 8.) Hearsay problems were generally cured by instructing the jury that out-of-court statements admitted through the expert could not be considered for their truth. (*Ibid.*) After the *Perez* trial concluded, the high court issued *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), in which it overturned *Gardeley* and *Montiel* and "expressly changed" the substantive law. (*Perez*, at p. 9; *Sanchez*, at p. 686, fn. 13.) The *Sanchez* court found it "cannot logically be maintained that the statements [related to a jury through an expert] are not being admitted for their truth." (*Perez*, at p. 9.) Thus, *Sanchez* held that an expert "cannot relate case-specific hearsay to explain the basis for his or her opinion unless the facts are independently proven or fall within a hearsay exception." (*Perez*, at p. 4.)

On appeal, the defendant in *Perez* asserted error in the admission of the prosecution's expert testimony based on the new rule promulgated in *Sanchez*. The *Perez* court held the challenge had not been forfeited despite defense counsel's failure to assert a confrontation clause objection at trial. The high court explained that " ' "reviewing courts have traditionally excused

13

parties for failing to raise an issue at trial where an objection would have been futile or *wholly unsupported by substantive law then in existence*." ' " (*Perez, supra*, 9 Cal.5th at pp. 7-8, quoting *People v. Brooks* (2017) 3 Cal.5th 1, 92, italics added.)  The court emphasized that "*Sanchez* marked a 'paradigm shift' " (*Perez*, at p. 12) and that prior to its issuance, the trial court would have been compelled to overrule "a case-specific hearsay objection to expert basis testimony" under *Gardeley* and *Montiel*.  (*Perez*, at p. 13.)  "Such a request in a trial court would therefore have been futile."  (*Ibid*.)  Penalizing trial counsel for the failure to object " ' " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." ' " ' "  (*Id*. at p. 9, quoting *People v. Edwards* (2013) 57 Cal.4th 658, 705.)

Here, Rhodes argues that *Perez* excuses his trial counsel's inaction because the state of the law before *Frahs* and *McKenzie* was "unclear."  We reject this characterization of *Perez*.  *Perez* applies not where the law is merely unclear, but in the narrower circumstance where an unpreserved issue gains credence only after the trial court proceeding under a paradigm-shifting high court decision equivalent to *Sanchez*.  *Frahs* and *McKenzie* were not such decisions.  Moreover, the circumstances faced by defense counsel at the time of Rhodes's probation revocation proceedings in December 2019 are distinguishable from those presented to defense counsel at the time of trial in *Perez*.

*Frahs* was preceded by *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), another decision involving a question of *Estrada* retroactivity. "Significantly, *Lara* considered a statute that included language regarding timing and procedure for transfer hearings.  A prosecutor seeking to try a

14

minor in adult court was required to file a motion 'prior to the attachment of jeopardy' in juvenile court.  [Citation.]  Despite this language, *Lara* concluded that the *Estrada* rule applied such that the new statutory procedure could be invoked even by defendants already charged and convicted as adults, as long as their judgments of conviction were not final." (*People v. Burns* (2019) 38 Cal.App.5th 776, 786 (*Burns*).)  In concluding that the language and legislative history of section 1001.36 did not overcome the *Estrada* presumption, the high court in *Frahs* relied extensively on reasoning it had employed in *Lara*.  (See *Frahs*, *supra,* 9 Cal.5th at pp. 631, 632, 634, 636-637.)  Unlike *Sanchez*, *Frahs* did not alter prior high court precedent nor did it transform the relevant substantive law.

When Rhodes's probation revocation proceedings took place, several intermediate appellate courts had decided that section 1001.36 applied retroactively under the *Estrada* rule to judgments that were not final at the time the statute became effective.  (See, e.g., *People v. Frahs* (2018) 27 Cal.App.5th 784, 791 [§ 1001.36 retroactive], affd. *Frahs*, *supra,* 9 Cal.5th at p. 641; *Burns*, *supra,* 38 Cal.App.5th at pp. 785-790 [§ 1001.36 retroactive]; *People v. Hughes* (2019) 39 Cal.App.5th 886, 894-896 [§ 1001.36 retroactive]; *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1113 [§ 1001.36 retroactive]; but see *People v. Craine* (2019) 35 Cal.App.5th 744, 749-760 [§ 1001.36 not retroactive], disapproved in *Frahs*, *supra*, 9 Cal.5th at p. 631, fn. 2.)  This scenario is unlike *Perez*, in which at the time of trial, "*every Court of Appeal* to address the issue" had rejected confrontation clause claims like the one the defendant sought to advance on appeal. (*Perez*, *supra*, 9 Cal.5th at p. 10, italics added.)

The People argue that like the defendants in the foregoing cases, defense counsel in this case could have advocated for retroactive application

of section 1001.36 even before *Frahs*. Rhodes compares this position to an argument unsuccessfully advanced by the Attorney General in *Perez*, that trial counsel was required to assert an objection if merited by anticipated trends in the law, based on the concurring or dissenting opinions of high court justices. (See *Perez*, *supra*, 9 Cal.5th at pp. 12-14.) We do not view the arguments as equivalent, because there was no high court precedent to overcome in this case.

Moreover, once the Courts of Appeal issued the decisions listed above, the grounds for pursuing retroactive application of section 1001.36 had been laid, and it did not require unusual foresight to anticipate a high court ruling finding mental health diversion to be available retroactively. In other words, a request for mental health diversion would not have been ' "wholly unsupported by substantive law then in existence." ' (*Perez*, *supra*, 9 Cal.5th at pp. 7-8, quoting *People v. Brooks* (2017) 3 Cal.5th 1, 92.)

Likewise, while the Supreme Court's decision in *McKenzie* was not issued until 2020, *McKenzie* did not shift the existing paradigm of finality and *Estrada* retroactivity. As Rhodes himself acknowledges, *McKenzie* merely "resolved the previously disputed issue" whether a defendant granted probation with the imposition of sentence suspended was among those to whom the benefits of ameliorative legislation were retroactively available. The relevant principles governing orders suspending sentence and granting probation were established well before *McKenzie*. (See, e.g., *McKenzie*, *supra*, 9 Cal.5th at p. 47 [explaining that "[u]nder our precedents" an order granting probation "has only 'limited finality' and ' " 'does not have the effect of a judgment for other purposes' " ' "], quoting *People v. Chavez* (2018) 4 Cal.5th 771, 786 (*Chavez*).) "In criminal actions, the terms 'judgment' and ' "sentence" ' are generally considered 'synonymous' (*People v. Spencer* (1969)

16

71 Cal.2d 933, 935, fn. 1), and there is no 'judgment of conviction' without a sentence (*In re Phillips* (1941) 17 Cal.2d 55, 58)." (*McKenzie, supra,* 9 Cal.5th at p. 46.)

"When probation is granted, however, the timing of the judgment can vary because a trial court may grant probation by either suspending *imposition* of the sentence, or by imposing the sentence and suspending its *execution*. (*People v. Segura* (2008) 44 Cal.4th 921, 932.)" (*People v. McKenzie* (2018) 25 Cal.App.5th 1207, 1214 (*People v. McKenzie*), affd. *McKenzie, supra*, 9 Cal.5th at p. 52.) "[W]hen the trial court initially suspends *imposition* of sentence and grants probation, 'no judgment is then pending against the probationer, who is subject only to the terms and conditions of the probation.' (*People v. Howard* (1997) 16 Cal.4th 1081, 1087 (*Howard*).)" (*People v. McKenzie, supra*, 25 Cal.App.5th at p. 1214; see *People v. Superior Court* (*Giron*) (1974) 11 Cal.3d 793, 796 ["Although . . . an order granting probation is 'deemed to be a final judgment' for the limited purpose of taking an appeal therefrom [citation], it does not have the effect of a judgment for other purposes."]; *Chavez, supra*, 4 Cal.5th at p. 781 ["In a case where a court suspends imposition of sentence, it pronounces no judgment at all, and a defendant is placed on probation with 'no judgment pending against [him].' "].)

Before the high court's decision in *McKenzie*, intermediate courts of appeal differed on the question of whether an order suspending imposition of sentence and granting probation was a nonfinal judgment for purposes of *Estrada* retroactivity. (Compare *People v. Superior Court* (*Rodas*) (2017) 10 Cal.App.5th 1316, 1321-1326 (*Rodas*) [holding that where defendant was placed on probation with imposition of sentence suspended, did not appeal the initial probation order, and years later moved to withdraw plea to obtain

17

benefits of intervening statutory amendment, under sections 1018 and 1237, "the process to appeal the conviction based on her no contest plea has ended, rendering final the conviction for retroactivity purposes"] with *In re May* (1976) 62 Cal.App.3d 165 [holding defendant placed on probation with imposition of sentence suspended had a nonfinal judgment such that "the rationale of *Estrada* applies to this case because the amendatory statute became effective after the commission of the act but before the judgment of conviction was final"], *People v. Eagle* (2016) 246 Cal.App.4th 275, 277-279 [agreeing with People's concession that defendant placed on probation with imposition of sentence suspended could take advantage of subsequent change in law because his "sentence was not final at the time the amendments . . . took effect" and that under *Estrada* he was "entitled to benefit retroactively from the changes to [the new statute]"], and *People v. McKenzie*, *supra*, 25 Cal.App.5th at pp. 1212-1218 & p. 1218, fn.8 [disagreeing with *Rodas* and holding the judgment of a defendant placed on probation with imposition of sentence suspended remained nonfinal on appeal for purposes of *Estrada* retroactivity].)

That the Courts of Appeal had reached different outcomes on this issue at the time of Rhodes's revocation proceedings distinguishes this case from *Perez*, where "*every Court of Appeal* to address the issue" had rejected claims like the one the defendant sought to advance on appeal. (*Perez*, *supra*, 9 Cal.5th at p. 10, italics added.) Moreover, in holding that the benefits of retroactive ameliorative legislation were available to a defendant appealing a sentence imposed upon a probation revocation, the high court reached the same conclusion as the intermediate appellate court whose decision it affirmed. (*McKenzie*, *supra*, 9 Cal.5th at p. 52.)

Holding Rhodes to the preservation requirement in this case is not tantamount to requiring his counsel to anticipate unforeseen changes in the law, assert a futile objection, or predict that the Supreme Court might in the future overrule its precedent. Therefore, we conclude *Perez* does not support excusing Rhodes's failure to seek mental health diversion in the trial court.

B. *The Record Does Not Support Excusing Rhodes's Forfeiture Based on the "Unsettled" State of the Law*

Aside from *Perez*, Rhodes relies, string-citation style, on the following cases to support the position that the "unsettled" state of the law before *Frahs* and *McKenzie* explains and excuses his counsel's failure to seek diversion in the trial court: *In re Gladys R.* (1970) 1 Cal.3d 855, 861 ["[W]e cannot expect an attorney to anticipate that an appellate court will later interpret the controlling sections in a manner contrary to the apparently prevalent contemporaneous interpretation."], *People v. Haston* (1968) 69 Cal.2d 233, 256, fn. 28 [excusing defense counsel's failure to object where it was not decided until after trial that a recent Supreme Court case applied to the evidence in question]; and *People v. Ruiz* (1990) 222 Cal.App.3d 1241, 1246 [finding it "not . . . unlikely that the inadequacy of" a showing establishing the admissibility of certain evidence "resulted more from the confusing state of the law than from the inability of [defendant] to establish facts meeting the [relevant evidentiary] requirements"].)

As discussed above, however, we reject Rhodes's underlying premise that the law was so unsettled in December 2019 that competent, knowledgeable defense counsel could not have discerned that the scope of individuals to whom mental health diversion was retroactively available included a defendant in Rhodes's position. (*People v. Black* (2007) 41 Cal.4th 799, 811 ["In determining whether the significance of a change in the law excuses counsel's failure to object at trial, we consider the 'state of the law as

19

it would have appeared to competent and knowledgeable counsel at the time of the trial.'  [Citation.]"], overruled on other grounds by *Cunningham v. California* (2007) 549 U.S. 270.)

C.  *Rhodes's Belated Contention About the Difficulty of Identifying a Procedure by which to Pursue Diversion Does Not Excuse His Counsel's Inaction*

In his reply brief, Rhodes appears to contend for the first time that his counsel's failure to pursue diversion in the trial court should be excused because it was unclear that the court possessed authority to vacate Rhodes's eight-year-old plea and grant diversion.  Even if we were to find good cause for Rhodes's failure to raise this argument earlier[7] (*People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."]), we would reject it.

Rhodes relies on section 1018[8] and *Rodas, supra,* 10 Cal.App.5th at pages 1319 to 1320, for the contention that it would have been unclear whether the trial court had authority at the time of his probation revocation proceedings to vacate his eight-year-old plea and grant diversion.  In *Rodas,*

---

[7]  Rhodes presents the argument as a reply to an assertion by the People that Rhodes, like other defendants seeking mental health diversion before *Frahs*, could have raised the issue of diversion at his sentencing after revocation proceeding.

[8]  Section 1018 provides in pertinent part that "[o]n application of the defendant at any time before judgment or within six months after an order granting probation is made if entry of judgment is suspended, the court may, and in case of a defendant who appeared without counsel at the time of the plea the court shall, for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted."

the Third District Court of Appeal held that because section 1018 imposes a six-month limit on the withdrawal of a plea, the trial court lacked jurisdiction to grant a motion to withdraw a nine-year-old no contest plea so that the defendant could take advantage of a recently-enacted ameliorative law. (*Rodas*, at pp. 1321-1326.) In so holding, however, the appellate court "recognize[d] that the rules governing writs of *coram nobis* may apply under the circumstances," although it declined to express a view as to the availability of relief under such a petition since none had been asserted. (*Id.* at p. 1326.) *Rodas* thus proposed a procedural mechanism for vacating a plea after expiration of the time limit under section 1018.

Moreover, we disagree with the premise that uncertainty about criminal procedure justifies counsel in taking no action at all to advocate for diversionary relief. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["[A] party may forfeit a right to present a claim of error to the appellate court if he did not do enough to 'prevent[]' or 'correct[]' the claimed error in the trial court . . . ."], quoting *Scott*, *supra*, 9 Cal.4th at p. 353; *Scott*, at p. 353 ["[C]ounsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing."]; *Trujillo*, *supra*, 60 Cal.4th at pp. 856-859.)

Accordingly, we conclude that Rhodes's mental health diversion claim has been forfeited. Because "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue" (see *In re S.B.* (2004) 32 Cal.4th 1287, 1293), we decline to exercise our discretion to consider the claim notwithstanding the forfeiture.

III.

21

*Error in Recording Probation Revocation Restitution Fine*

Rhodes contends there was an error in preparing the sentencing minute order and abstract of judgment. When Rhodes was originally sentenced in 2011, a probation revocation fine of $200 under section 1202.44 was imposed and was suspended unless probation was revoked. During the sentencing after revocation hearing on December 30, 2019, the trial court stated that the "$300 restitution fine originally imposed [shall be] reimposed on the violation *or $200 at the time . . . .*" (Italics added.) However, both the minutes and the abstract of judgment reflect a probation revocation restitution fine of $300. Rhodes contends the minute order and abstract of judgment vary from the judgment pronounced by the court. He additionally contends that the maximum restitution fine that could lawfully have been "reimposed" under section 1202.44 is the originally imposed $200. Rhodes asks us to instruct the court to modify the minute order and abstract of judgment.

We agree with the People's concession that the correct amount of the probation revocation restitution fine is $200 and that the minute order and abstract of judgment should be amended to so reflect and will instruct the trial court accordingly.[9] (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 858 ["[T]he oral pronouncement of judgment controls over the minutes and abstract of judgment."], citing *People v. Zackery* (2007) 147 Cal.App.4th 380,

[9] Rhodes additionally requests an order that any money collected in excess of the corrected amount be returned to him. This presumes excess monies were collected, and that any excess will not be remitted to Rhodes in due course upon correction of the abstract of judgment. We decline to issue the requested order preemptively. This decision is without prejudice to Rhodes seeking relief in the trial court or other appropriate authority.

385; § 1202.44 ["In every case in which a person is convicted of a crime and a conditional sentence or a sentence that includes a period of probation is imposed, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional probation revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."].)

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment and sentencing minute order to reflect imposition of a $200 probation revocation restitution fine under section 1202.44. The court shall forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


DO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.


23